Voto particular disidente emitido por la
Juez Asociada Se-ñora Rodríguez Rodríguez,
al que se une el Juez Presi-dente Señor Hernández Denton.
A sesenta años de la firma de la Constitución del Estado Libre Asociado de Puerto Rico, el País es testigo de lo que, probablemente, pueda catalogarse como la más grave crisis constitucional de su Historia.(1) Las Resoluciones de epí-grafe, aprobadas por una mayoría de los miembros de este Tribunal, no caben en el texto que se firmó el 6 de febrero *655 de 1952 y que el Pueblo ratificó con su voto, mayoritaria-mente, meses más tarde. Es lastimoso observar cómo aque-llos entendidos colectivos procurados por hombres y muje-res de bien, se minusvaloran de tal manera, que colocan a este Tribunal al margen del ordenamiento constitucional establecido.
En estos momentos, cuando conmemoramos un evento tan significativo como la firma de nuestra Constitución, hoy bajo asedio, recordemos a esos hombres y mujeres quienes, sin importar su proceder, su pensamiento o su ideología, supieron apreciar y aquilatar el excelso docu-mento que suscribían, prestándole su adhesión. Así, antes o después de firmar el texto constitucional aquel sexagé-simo segundo día de sesión, esto fue lo que dijeron:
Sr. GUTI[É]RREZ FRANQUI: ...
Acabamos de firmar el documento que contiene la Constitu-ción del Estado Libre Asociado de Puerto Rico, escrita por el pueblo de Puerto Rico a través de sus delegados designados a ese efecto. No puedo pensar en otro momento de nuestra histo-ria que pueda compararse con éste, en cuanto a su significa-ción y trascendencia.
Sr. GELP[Í]: Sr. Presidente; compañeros delegados:
Yo realmente no s[é] qué admirar más en este momento tan solemne para el pueblo de Puerto Rico — principalmente por la responsabilidad que envuelve para los hombres que hemos estado aquí laborando, uno y otro día, para hacer lo mejor que hemos creído que se puede hacer actualmente en beneficio del pueblo de Puerto Rico — yo no sé si es la propia Constitución, que yo creo es el documento más importante que han podido escribir los puertorriqueños hasta la fecha, hasta el día de hoy, o esta armonía tan grande, esta confraternidad que se viene expresando en el semblante de todos los delegados, donde no ha habido diferencia de personas, de ideales ni de nada, sino todos unidos en un solo pensamiento, en el pensamiento de Puerto Rico, en hacer lo mejor que se pueda para este pueblo.
Sr. FERR[É]: Señor Presidente; compañeros delegados, y distinguidos visitantes:
Poco me queda por decir en este hemiciclo augusto que no haya ya dicho yo en defensa de los principios que he susten-tado y defendido con toda humildad toda mi vida. Al cerrar sus *656 trabajos esta Convención Constituyente, sólo me resta decir que regreso a mi hogar, tranquilo con mi conciencia ....
También me voy satisfecho, como puertorriqueño, porque a pesar de la discrepancia que nos ha mantenido y aún nos man-tiene separados en cuestiones fundamentales, hemos llevado a cabo nuestro trabajo en un plano de elevada actitud cordial y de nobles motivaciones. Eso nada más sería suficiente, compa-ñeros, para que yo me sintiera orgulloso de haber participado en las deliberaciones de un grupo de compatriotas tan distinguidos.
Sr. GARC[Í]A M[É]NDEZ: Señor Presidente, distinguidos visitantes, queridos compañeros: Sólo dos palabras: ... Voy sólo a deciros que a pesar de que comenzamos con discrepan-cias fuertes y continuamos luego luchando con nuestras dis-crepancias nobles; y a pesar de que comenzamos, como diría Ñervo, juntos y separados como los remos de una misma barca, a la postre, luego de haber terminado este trabajo —que no se sabe fuera de aquí lo mucho que cansa el cerebro y lo mucho que a veces estruja el corazón— hemos terminado en forma tal: ustedes han usado de un espíritu y [actuado] con el corazón levantado, aceptando las enmiendas que para noso-tros eran sine qua non. Y yo creo que tengo derecho a decir, saliendo sinceramente de los hornos secretos de mi corazón, que los delegados que estamos aquí reunidos en este momento trascendente para la historia de nuestro país, han realizado una labor y han terminado redactando un documento que es honra de Puerto Rico y de los puertorriqueños. ...

... [E]levemos nuestro pensamiento a Dios; para que en el silencio de esta plegaria esta Constitución toque a rebato en nuestros corazones, la podamos defender con uñas y con dien-tes y en definitiva nos traiga la felicidad a todos los puertorri-queños bajo el amplio palio de una amada tierra p uertorriqueña.

Sr. PADR[Ó]N RIVERA: ... Después de haberse firmado la Constitución la delegación socialista que tengo el alto honor de presidir desea expresar que siente una profunda satisfacción por haber cumplido un deber patriótico cooperando en el deseo mutuo de todos los partidos aquí representados por el éxito de tener una constitución que encarna la conciencia de nuestro pueblo.
*657 No tengo temor en declarar que he adquirido una gran ex-periencia durante todo el proceso constitucional. La experien-cia que me ha dado el estudio de todas las constituciones de los Estados Unidos de América, de América Latina y de Europa me puso en condiciones para hacer un estudio comparativo con nuestra Constitución y me siento orgulloso de poder decir ahora que ninguna de esas constituciones sanciona y consagra los derechos del pueblo en forma tan democrática como nuestra Constitución.
Se dijo que la Constitución estaba hecha. Yo tuve mis dudas sobre lo contrario pero luego aclaré mi mente y confieso con honradez intelectual y como líder responsable de un partido que no hay un solo delegado en esta Constituyente que no haya puesto su contribución en la redacción de esta Constitución. Y la Constitución es buena porque ella encarna la conciencia de los tres partidos aquí representados; por eso todos la hemos firmado para glorificarla en la historia de nuestra patria. (En-fasis nuestro y corchetes suplidos y en el original.) 4 Diario de Sesiones de la Convención Constituyente 2464-2476 (ed. 1961) (en adelante Diario de Sesiones).

¡Celebremos el espíritu y la altura de miras que fue; ini-ciemos la lucha para recuperarlo!

Todo lo cual se hace necesario porque las Resoluciones aprobadas usurpan facultades constitucionales del Juez Presidente y lesionan principios democráticos de primer orden. Nos colocan en una zona oscura donde se hace im-posible distinguir entre la excepción y la regla. Véase Gior-gio Agamben, Homo Sacer, España, Pre-Textos, 2006. No albergo duda de que desde este momento esta Curia ha escogido transitar por un ensortijado camino que nos aparta del sendero democrático que, como pueblo, había-mos decidido recorrer juntos. La acción que toma una ma-yoría de este Tribunal representa un retroceso en nuestro sistema político-democrático. Vale la pena aclarar que para que una decisión sea democrática, no es suficiente con que haya sido aprobada por una mayoría. Además de la apro-bación mayoritaria, la decisión deberá reflejar los entendi-dos básicos y valores democráticos establecidos en la *658 Constitución. Véase A. Barak, The Judge in a Democracy, Oxford, Princeton University Press, 2006, págs. 23-27.(2)
Acorde con lo anterior, es mi deber recordarles a los in-tegrantes de la mayoría de este Tribunal que una condición principalísima de cualquier orden democrático es la insti-tucionalización de los entendidos colectivos a los cuales los miembros del cuerpo social han llegado. La falta de dicha institucionalización imposibilita garantizar la estabilidad social y apareja, con ello, la pérdida de legitimidad ante quienes han acordado ceder parte de sus prerrogativas in-dividuales en pos de que el Estado provea, cuanto menos, igualdad ante la ley. No es casual que, en todas las demo-cracias liberales, la forma por antonomasia de institucio-nalización de estos acuerdos sea la Constitución. Es la Constitución la que da continuidad y garantía a la demo-cracia como forma de organización política. Los acuerdos plasmados en ésta no pueden —ni deben— estar sujetos a la cambiante voluntad de quienes tienen el rol de interpretarla.
El juez Breyer señala: “[t]he Constitution sets boundaries within which the institutions of government must act. And the Court’s constitutional job is primarily that of a boundary patrol.” Stephen Bryer, Making Our Democracy Work: The Yale Lectures, The Yale Law Journal, pág. 20 (2011). Hoy una mayoría de este Tribunal ha traspasado esas fronteras en un afán goloso de apropiarse de aquello que no le corresponde: los poderes del Juez Presidente.
Es mi obligación reiterar nuevamente que la dúctil in-terpretación de la Ley Suprema pone en riesgo la estabili-dad y la confianza que la ciudadanía ha depositado en este cuerpo como el más Alto Foro judicial y lacera nuestra democracia. El proceder mayoritario que hoy rechazamos *659 socava la legitimidad de esta Institución y crea un estado de excepción que, más que conservar el estado de derecho, lo revoca a su propia voluntad.
En este sentido, Giorgio Agamben(3) señala que “[e]l Es-tado de excepción no es un derecho especial (como el dere-cho de guerra) sino que, en cuanto suspensión del propio orden jurídico, define el umbral o el concepto límite”. G. Agamben, Estado de Excepción, Buenos Aires, Adriana Hi-dalgo Editores, 2004, pág. 28. Todo indica que nos encon-tramos ante otro momento de excepción donde, tras el sub-terfugio de la interpretación de nuestro poder de reglamentar, se suspenden arbitrariamente las potestades constitucionales del Juez Presidente. Irrumpir indebida-mente en dichas facultades en el marco de una investiga-ción independiente no hace otra cosa que lacerar la legiti-midad de este Tribunal como el último foro garantizador de justicia. Indubitadamente estamos ante un concepto límite que presagia el lento pero seguro derrocamiento de nuestro orden constitucional.
Es por ello que el lenguaje de la Resolución certificada por la mayoría de este Tribunal es revelador. En ésta se deja entrever el espacio creado entre la norma y su aplica-ción para que, mediante una interpretación forzada, se construya un espejismo de corrección jurídica. Decir hoy que las actuaciones de esta Curia están dirigidas a “defender la independencia del Poder Judicial y los preceptos de nuestra función constitucional, y en respuesta a la necesi-dad de mantener mecanismos efectivos y transparentes para atender aquellas investigaciones realizadas por la Rama Judicial”, In re Aprobación Rs. Proc. Esp. RJ, 184 *660 D.P.R. 500, 502 (2012), no es otra cosa que tergiversar el estado de derecho vigente para ocultar la inconstituciona-lidad de una reglamentación que a todas luces lo es.
I
Pasemos a ver entonces qué dice la Constitución sobre la controversia que hoy pende ante el País. Para ello debe-mos analizar el texto constitucional tomando en cuenta los factores siguientes: el propio texto; el marco teórico y las disposiciones de otras jurisdicciones que le sirvieron de in-fluencia; el entendido de los constituyentes; el contexto his-tórico en que se promulga; el comportamiento durante se-senta años de los actores constitucionales que han vivido su historia, y como siempre, todo ello en armonía con el sentido común y sin ánimo prevenido.(4) Finalmente, en esta tarea debemos procurar que la interpretación que ha-gamos pueda armonizar las distintas oraciones del texto interpretado, de suerte que nuestra lectura no tenga el efecto real de negar el alcance de una cláusula a favor de otra.
A
La Sección 7 del Artículo V de la Constitución del Es-tado Libre Asociado de Puerto Rico dispone:
El Tribunal Supremo adoptará reglas para la administra-ción de los tribunales las que estarán sujetas a las leyes rela-tivas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. El Juez Presidente dirigirá la administración de los tribunales y *661 nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado. (Enfasis nuestro.) Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 416.
La mayoría se ampara en la primera oración de la See. 7 del Art. V de la Constitución para justificar su actuación.
Resumamos el pensamiento textualista de la mayoría, que dice: como la primera oración de la See. 7 del Art. V faculta al Tribunal a adoptar reglas “para la administra-ción de los tribunales” y la segunda oración indica que el Juez Presidente dirigirá “la administración de los tribuna-les”, ambas oraciones hablan del mismo asunto, con lo cual, el Juez Presidente “administrará los tribunales” de acuerdo como nosotros, la mayoría del Tribunal, disponga-mos a través de la reglamentación que promulguemos. El problema con esta conclusión es que yerra en sus premisas. Nos confrontamos así con un silogismo defectuoso. Más que todo, este razonamiento retrata un argumento circular y aporético en la medida en que presume la corrección de lo que se intenta probar en el intento de probarlo. Véase Ru-ggero J. Aldisert, Logic for Lawyers, A Guide to Clear Legal Thinking, Clark Boardman Co., 1989; I.M. Copi y C. Cohen, Introduction to Logic, Prentice Hall, 2007. El propó-sito evidente de este argumento circular es tergiversar el texto constitucional para crear un espectro de legitimidad.
B
La cláusula constitucional bajo análisis se deriva prin-cipalmente del sistema inglés. Su origen directo se encuen-tra en una disposición análoga de la Constitución del es-tado de Nueva Jersey, la cual dispone lo siguiente en la Sección 7 de su Artículo VI:
The Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State. He shall appoint an Administrative Director to serve at his pleasure.
La precitada cláusula se basó, a su vez, en los escritos *662 de teóricos influyentes de la época, tales como Roscoe Pound —véase, e.g., R. Pound, Organization of Courts, Boston, Ed. Little, Brown and Company, 1940— y Arthur T. Vanderbilt cuya obra Minimun Standards of Judicial Interpretation (1949), se convertiría luego en la piedra angular de las sucesivas guías modelos creadas por la American Bar Association para la organización de los tribuna-les estatales. Ambos escritores compartían la visión de que la supervisión de la totalidad del sistema judicial debía recaer sobre la figura del Juez Presidente. Así, Vanderbilt señalaba: “[E]very judicial system must have a single administrative head who has the power and responsibility for making the judicial establishment function efficiently.” A.T. Vanderbilt, Cases and Other Materials on Modern Procedure and Judicial Administration, Nueva York, Washington Square Publishing Corporation, 1952, pág. 1253.
Basándose en estos preceptos, el Comité sobre los Es-tándares de Administración Judicial de la American Bar Association expresó:
The chief justice should provide the court system with intellectual and professional leadership. He should also excercise powers of general supervision, including:
(i) assignment of judicial and non-judicial personnel;
(ii) Supervision of the court system’s financial affairs, its program of continuing education for judicial and non-judicial personnel, and its planning and operations research;
(iii) Serving as chief representative of the court system in relating with other branches of government and with the public;
(iv) Being general superintendent of the work of administrative staff of the court system. (Enfasis nuestro.) American Bar Association, Court Organization, 1974, pág. 81.
Incluso el Tribunal Supremo de Estados Unidos tuvo la oportunidad de interpretar esta disposición de la Constitu-ción de Nueva Jersey. En Kugler v. Helfant, 421 U.S. 117 (1975), el máximo Foro federal dejó sin efecto una determi-nación del Tribunal de Apelaciones que hubiera permitido la interferencia de la Corte de Distrito federal en un pro- *663 cedimiento criminal del estado de Nueva Jersey. En dicho caso, el Tribunal señaló, sin ambages: “[I]t is not the New Jersey Supreme Court, or its members, but the Chief Justice, who is the ‘administrative head’ of the New Jersey court system.” íd., pág. 128. Lógicamente, del mismo modo que en la jurisdicción de la cual adoptamos la cláusula constitucional que hoy analizamos, en nuestro ordena-miento tampoco corresponde al Tribunal Supremo ni a sus miembros, sino al Juez Presidente, administrar la Rama Judicial.
C
Los constituyentes fueron claros en su redacción de la See. 7 del Art. V. Estos dejaron establecido que la disposi-ción constitucional interpretada constituía un mecanismo para garantizar la independencia judicial, habida cuenta que, hasta entonces, el Procurador General era quien ges-tionaba la administración de la Justicia. Diario de Sesio-nes, T. 2, pág. 617, y T. 3, pág. 1667. Esta injerencia del Poder Ejecutivo sobre el Poder Judicial ofendía la separa-ción de poderes que recogía el nuevo texto constitucional, lacerando la independencia judicial. Curiosamente, en los debates de la Convención Constituyente hubo quien pro-puso que se eliminase la función del Juez Presidente como su administrador y se mantuviese al entonces Procurador General llevando a cabo esa labor. Esta propuesta fue derrotada. Véase Diario de Sesiones, T. 1, págs. 616-618.
Por otra parte, la discusión en el seno de la Convención en torno al nombramiento del director administrativo de los tribunales es ilustrativa del sentir de los constituyentes sobre los poderes del Juez Presidente. El delegado señor Ramos Antonini comentó que la Convención Constitu-yente, con su proceder, buscaba proteger al Juez Presi-dente “en el desempeño de su responsabilidad y descargue de su autoridad para que pueda cumplir con la encomienda *664 de la constitución que le dice que él dirigirá la administra-ción [de los tribunales]”. Diario de Sesiones, T. 3, pág. 1667. Ramos Antonini conminó a los miembros de la Con-vención a que no actuasen para “coartar [la] libertad [del Juez Presidente]” y limitar su “eficiencia” en el descargo de la encomienda que la Constitución le había confiado po-niendo trabas sobre el desempeño del Director Administra-tivo de los Tribunales. Id.
Don José Trías Monge, nuestro más insigne constitucio-nalista, miembro de la Convención Constituyente y Juez Presidente de este Tribunal, al explicar el alcance y conte-nido de esta encomienda constitucional, nos señala lo si-guiente: “Fue parte esencial de la intención legislativa evi-tar a todo trance huella alguna de administración colegiada.” J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 98. Dicho de otra manera, esta disposición constitucional pre-tende proteger la independencia del Juez Presidente en su función administrativa, del mecanismo colegiado que prima en la función de adjudicación de los miembros de este Tribunal.
Esto no quiere decir que el Juez Presidente no deba, por consideraciones prudenciales y de deferencia, informar a los miembros de esta Curia de los asuntos más trascenden-tales que afectan a la Rama Judicial, “a la par que debe estar siempre dispuesto a solicitar o recibir en tales asun-tos los valiosos consejos de sus compañeros del estrado”. J. Trías Monge, El sistema judicial de Puerto Rico, Río Pie-dras, Ed. U.P.R., 1978, pág. 222. No obstante, aconsejar al Juez Presidente no es sinónimo de impartir directrices a él o a la Directora Administrativa de los Tribunales en el des-cargo de las funciones que la Constitución les confirió. Los consejos se imparten cuando se solicitan y no hay obliga-ción legal alguna de solicitarlos.
*665 Por otra parte, el Informe de la Comisión de la Rama Judicial a la Convención Constituyente enumera, “sin que se entiendan excluidas otras similares y análogas”, las fun-ciones administrativas de los tribunales, para cuya ejecu-ción e implantación la Constitución ha designado al Juez Presidente. De éstas, vale destacar las siguientes: “(2) Al-quilar locales, comprar y proveer equipo y servicios. ... (4) Investigar quejas y formular cargos, ante la autoridad co-rrespondiente, contra funcionarios y empleados. (5) Autori-zar desembolsos dispuestos por ley y revisar^) las cuentas de todos los tribunales. ... (8) Superentender(6) en los tribunales”.(7) (Enfasis nuestro y escolio omitido.) Diario de Sesiones, T. 4, pág. 2613. Para poder cumplir con la pri-mera de estas funciones se hace necesario, evidentemente, la aprobación de contratos, prerrogativa ínsita al poder de administrar cualquier entidad. La encomienda quinta antes transcrita es reveladora porque establece, con meri-diana claridad, que los constituyentes consideraron como una prerrogativa administrativa del Juez Presidente “revi-sar o supervisar” las cuentas de todos los tribunales. Es decir, ya la Convención pasó juicio sobre a quién le corres-ponde la facultad de “revisar las cuentas de todos los tribu-nales” y concluyó que ésta era una de las prerrogativas administrativas que se delegaban al Juez Presidente. Pa- *666 rece lógico concluir entonces que el Juez Presidente, a tra-vés de la Directora Administrativa de los Tribunales, ejerce una función de naturaleza administrativa de su exclusiva incumbencia cuando contrata para que se revisen las cuen-tas de todos los tribunales.
No obstante la claridad del texto, la mayoría de esta Curia se refugia en la primera oración de la See. 7 del Art. V de la Constitución.
Las Resoluciones aprobadas por este Tribunal el 1 de febrero de 2012 desvirtúan el propósito de nuestra Consti-tución de que, por un lado, el Tribunal en Pleno adopte reglas y que, por el otro, la administración de los tribuna-les recaiga sobre la figura del Juez Presidente. Ya vimos que los constituyentes dejaron claramente establecido que la facultad de reglamentar que se atribuía al Tribunal Supremo estaba enmarcada en el deseo de desligar la admi-nistración del sistema judicial del Poder Ejecutivo de suerte que, cuando el Poder Legislativo y el Poder Ejecu-tivo aprueben “leyes relativas a los suministros, personal, asignación y fiscalización de fondos”, no le dicten al Poder Judicial normas de conducta. Lo que plasmaron los consti-tuyentes fue que sea el propio Tribunal quien atempere su reglamentación a lo dispuesto por las ramas políticas del Gobierno. En este tenor, esta disposición lo que pretende hacer es garantizar la independencia judicial de los Pode-res Ejecutivo y Legislativo.
Leer otra cosa en el texto constitucional es faltar al rigor que se exige de este Tribunal. No debemos confundir ni, mucho menos, fusionar el poder de reglamentar con el de administrar. La interpretación propuesta por la mayoría lo que hace es negar el alcance de la facultad de administra-ción del Juez Presidente. Es decir, la primera oración lo que representa es una limitación a la segunda oración, mas no una erradicación. No le podemos atribuir a los constitu-yentes la creación de un andamiaje tan absurdo. Lo cierto es que no hay nada en el texto constitucional que permita *667 la lectura que una mayoría de este Tribunal pretende validar. Por lo tanto, no es allí donde encontramos su razón de ser.
D
En cuanto al entendido colectivo de los actores constitu-cionales, es meritorio señalar que en 1965 el Comité para el Estudio y Evaluación del Sistema Judicial analizó varios temas relacionados con la administración de la justicia, en-tre ellos, el rol y la función de la Oficina de la Administra-ción de los Tribunales y de la persona que la dirige. Sobre las facultades del Director Administrativo, el Informe ren-dido indica:
... El Director Administrativo, según su mismo título cons-titucional indica, no puede limitarse a las funciones de estado mayor —de asesoramiento y servicios auxiliares— pues tam-bién debe y tiene que ser ayudante ejecutivo en el segundo escalafón de la jerarquía.
... Ambos funcionarios deben ordenar su división de trabajo y cultivar su relación oficial para producir un liderato unifi-cado y eficaz como se hace en tantas empresas públicas y pri-vadas, pues todo organismo administrativo de gran compleji-dad inevitablemente requiere que la capacidad directiva del líder principal se amplíe mediante la colaboración de ayudan-tes ejecutivos y de estado mayor.
... Cualquier limitación que se le imponga al Juez Presidente que no le permita cumplir con su responsabilidad de principal dirigente, tiene que ser muy perjudicial. Asimismo será des-tructiva toda tendencia que no conduzca a obtener el máximo rendimiento del puesto de Director Administrativo, como el se-gundo eslabón en la línea ejecutiva. (Enfansis nuestro.) Co-mité para el Estudio y la Evaluación del Sistema Judicial, Informe al Tribunal Supremo de Puerto Rico sobre la Oficina de Administración de los Tribunales, marzo de 1965, págs. 4-5.
Sobre las facultades administrativas del Juez Presi-dente, las expresiones del Comité aludido recogen diáfana-mente lo que ya era desde entonces, y seguía siendo hasta hoy, una concepción generalizada:
*668 ... De todas las actividades del Juez Presidente, la más im-portante es la dirección administrativa de la Rama Judicial, por la cual es responsable constitucionalmente. En él deben encamar los principios y las normas fundamentales de la labor judicial en conjunción con los procedimientos administra-tivos de mayor eficacia. Es [él] el último y único centro de con-vergencia de todo el sistema de administrar la justicia. Esta responsabilidad no es delegable. (Énfasis nuestro.) Informe, supra, pág. 4.
Por tal razón, la dirección de la Rama Judicial “puede ser objeto de asesoramiento por parte de los jueces asocia-dos o del Tribunal en pleno pero no compartirse en forma colegiada”. Id., pág. 6. Esta postura ha sido respaldada his-tóricamente en la mayoría de las jurisdicciones estatales que poseen sistemas unificados como el nuestro:
Experience in both business and government organizations has established conclusively that effective administration requires the fixing of authority and responsibility. There should be no room for doubt in anyone’s mind —be he judge, lawyer, litigant, legislator or layman— who has the responsibility for making a court system work well, both at the state and the local level. This means that responsibility must be fixed both for establishing court administrative policies and for the execution of those policies ....
While general policy may appropriately be formulated by a group, responsibility for executing policy must be vested in an individual. Logically, the chief justice of the State’s highest court should have that responsibility and authority, and in states having an integrated judicial system this is the common pattern. ABA Section on Judicial Administration, The Improvement of the Administration of Justice, Chicago, ABA, 1971, pág. 14.
A su vez, la sociedad puertorriqueña ha expresado en los pasados sesenta años esa concepción colectiva sobre la figura del Juez Presidente como único administrador, se-gún hemos reseñado, por medio de las leyes promulgadas. A modo de ejemplo, véase la Ley de la Judicatura del Es-tado Libre Asociado de Puerto Rico, Ley Núm. 201 de 22 de agosto de 2003, en cuyo Artículo 2.012, 4 L.P.R.A. sec. 24j, dispone que el “Juez Presidente del Tribunal Supremo di *669 rigirá la administración del Tribunal General de Justicia, será responsable del funcionamiento eficiente de los tribu-nales, promoverá la responsabilidad de los jueces en la eje-cución de sus obligaciones judiciales y velará por el cum-plimiento de los principios y objetivos de [esta Ley]”.
Es con este trasfondo jurídico que hay que evaluar y analizar el contenido de las Resoluciones que hoy se aprueban.
II
Con las Resoluciones de epígrafe aprobadas por una ma-yoría de esta Curia, las concepciones generalizadas sobre las funciones administrativas del Juez Presidente resultan truncas. La Resolución para aprobar las Reglas para los Procedimientos de Investigaciones Especiales Indepen-dientes de la Rama Judicial indica que la investigación “se hizo con el aval y conocimiento del Juez Presidente ... sin la consulta ni notificación previa al Tribunal en Pleno”. (Enfasis nuestro.) In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 500. Las preguntas que debemos hacernos al res-pecto son: ¿acaso nuestra Constitución no dispone que el Juez Presidente dirigirá la administración de los tribuna-les?, ¿acaso no dice la Constitución que el Juez Presidente nombrará un director administrativo, quien desempeñará su cargo a su discreción?, ¿acaso nuestra Ley Suprema exige que el Juez Presidente consulte o notifique al Pleno del Tribunal sobre sus actuaciones como administrador?, ¿acaso existía al momento de ordenarse la investigación un reglamento o disposición que prohibiera al Juez Presidente o a la Directora Administrativa de los Tribunales realizar dicha investigación? Veamos una por una.
Como se mencionó, nuestra Constitución dispone clara-mente que el Juez Presidente será el único administrador de los tribunales. Tan clara es dicha disposición, que el ideario colectivo y acervo jurídico de Puerto Rico lo ha re- *670 conocido por más de sesenta años.(8) En cuanto a la segunda interrogante, respondemos de igual manera: la propia Cons-titución es completamente diáfana en cuanto a ello.(9) Sobre la tercera pregunta, si el Juez Presidente tiene la obligación de consultar al Pleno su intención de comenzar una investi-gación interna, es evidente que la Constitución no dispone eso.(10) Hacer creer, bajo la apariencia de una supuesta lega-lidad, que ello corresponde así, es un acto inicuo que tergi-versa el texto de la Constitución para que en ésta se refleje algo que no se dijo y que nunca fue la intención de la Con-vención Constituyente decir.
En cuanto a la cuarta interrogante esbozada, esto es, si al momento de ordenarse la investigación algún regla-mento prohibía al Juez Presidente o a la Directora Admi-nistrativa de los Tribunales realizar dicha investigación, debemos advertir que nada lo prohibía. Todo lo contrario, la Orden Administrativa OA-JP-2009-108 de 18 de mayo de 2009, emitida por el Juez Presidente, Hon. Federico Hernández Denton, bajo la autorización expresa de la Sec-ción 7 del Artículo V de nuestra Constitución, dispone que entre los deberes y las obligaciones de la Oficina de Admi-nistración de los Tribunales se encuentran:
1) Evaluar continuamente los métodos administrativos y la eficiencia del personal del Tribunal General de Justicia y ha-cer recomendaciones al(a la) Juez(a) Presidente(a) para mejo-rar el funcionamiento de los tribunales y las demás dependen-cias de la Rama Judicial.
*671 8) Preparar y llevar libros adecuados de contabilidad y dispo-ner todo lo relacionado con los procedimientos y las normas fiscales aplicables al Tribunal General de Justicia.
9) Tomar todas aquellas medidas necesarias y aprobar las normas y la reglamentación pertinentes relacionadas con la contabilidad y el control de la propiedad de la Rama Judicial.
13) Por delegación del(de la) Juez(a) Presidente(a), adquirir en cualquier forma legal; poseer, conservar, usar, disponer de cualquier bien mueble o inmueble, valor, derecho o interés en el mismo; comparecer en los contratos y formalizar todos los instrumentos necesarios o convenientes ....
15) Desempeñar cualquier otra encomienda que el Juez Presi-dente le delegue para la consecución de una administración óptima de la justicia. (Enfasis nuestro.)
En vista de lo anterior, la prudencia intelectual y la ra-zonabilidad llevan a concluir que al contratar con el Ledo. César López Cintrón, la Directora Administrativa de los Tribunales actuó dentro de sus parámetros legales y al am-paro de las facultades constitucionales provistas al Juez Presidente. Hacer ver lo contrario, además de no reflejar el rigor esperado, constituye una pretensión extrajurídica e inconstitucional.
Aparte de lo anterior, una mayoría de este Tribunal induce nuevamente a error al expresar:
La Constitución ... no le reconoce a la Administración de los Tribunales autoridad para realizar investigaciones disciplina-rias sobre la conducta de los Jueces y las Juezas del Tribunal Supremo. Estos solo “podrán ser destituidos por las causas y mediante el procedimiento” de residenciamiento que la Cons-titución coloca en manos de la Asamblea Legislativa. ... Por otro lado, la facultad de investigar la posible comisión de de-litos y de “hacer cumplir las leyes” recae en el Poder Ejecutivo. In re Aprobación Rs. Proc. Esp. RJ, supra, págs. 501-502.
Tales expresiones pretenden equiparar una investiga-ción interna sobre la salud de los recursos de la Rama Judicial con un proceso de residenciamiento. Ambos procesos son independientes y disímiles. Abona a la confusión tratar *672 de igualarlos, como igual pretende hacer la mayoría en su Voto de Conformidad en un intento que induce a error.
Por otra parte, preocupa el lenguaje utilizado en las Re-soluciones aprobadas, pues denota una adjudicación judicial a priori para referirse a investigaciones que realizan otras ramas de gobierno sobre la figura del Juez Presidente. No podemos ignorar que “una palabra es mu-cho más que una palabra: es una toma de poder, un arma que permite la modificación de la circunstancia, una licen-cia para instalarse en el mundo”. L.R. Sánchez, La generación o sea, en: El placer de leer y escribir 405, 407-408 (2002). Las palabras que se utilizan en la Resoluciones in-dican que una mayoría de esta Curia ha llegado a conjetu-ras y conclusiones especulativas sobre los señalamientos contra el Juez Presidente. Todo ello sin haber escuchado a las partes involucradas. Este juicio adelantado es de todo punto incompatible con nuestra función de impartir justi-cia imparcial. (11) Si desea esta mayoría “fomentar la trans-parencia de los procedimientos e impulsar la confianza del Pueblo en nuestro sistema”, como sostienen las Resolucio-nes, con tales expresiones que cargan el significado de una adjudicación precipitada se lacera la imagen de imparcia-lidad y ecuanimidad que debemos tener todos los que nos investimos con la toga de la justiciad.(12)
Según hemos señalado, la Constitución provee una directriz sobre las funciones de administración de la Rama Judicial. Con las Resoluciones aprobadas, la mayoría de este Tribunal intenta utilizar el subterfugio del poder de reglamentar para abolir un acto administrativo validado *673 constitucionalmente. Es preciso esclarecer que si bien nuestra Constitución faculta unos poderes para que el Tribunal reglamente, ello no implica que éstos se utilicen para controlar o administrar la Rama Judicial. Como muy bien señala la mayoría en su escrito colectivo de conformi-dad, el asunto aquí en controversia es el poder. Sin embargo, omiten que se trata principalmente de la aspiración a un poder no delegado. Las Resoluciones aprobadas por quienes suscriben el Voto de Conformidad sencillamente intentan crear confusión y apariencia de legalidad de los actos de arrogación de poder de la mayoría.(13)
Es imperativo recordar que el deber ministerial de los Jueces Asociados es adjudicar y, en todo caso, asesorar al Juez Presidente cuando así lo solicite. Trías Monge, El sis-tema judicial de Puerto Rico, op. cit., pág. 222. Mas no es nuestro deber administrar la Rama Judicial en calidad de jueces presidentes, como pretende la mayoría en las dos Resoluciones y en el Voto de Conformidad.(14) De quererlo, así hubiera dispuesto la Convención Constituyente, pero todos sabemos que tal no fue su intención. Véase Diario de Sesiones, T. 1, págs. 616-618.
Aparte de los dislates jurídicos mencionados que aca-rrean las Resoluciones de epígrafe, es harto importante se-ñalar que una mayoría de esta Curia incide sobre la su-bordinación laboral que prescribe la Constitución al definir que la figura del Director Administrativo de los Tribunales desempeñará su cargo a discreción del Juez Presidente. Esta composición binaria no acepta, y en estricta lógica inversa la Constitución lo prohíbe, que el Pleno del Tribunal Supremo dé órdenes a un oficial que constitucional- *674 mente responde al Juez Presidente. Es por ello que la or-den emitida a la Directora Administrativa de los Tribunales, so pena de desacato, a los fines de “dej [ar] sin efecto de manera inmediata el contrato otorgado por la OAT al Ledo. César López Cintrón y cualquier otra contra-tación relacionada con la investigación” —(énfasis supri-mido) In re Miembros Com. Esp. Independiente, 184 D.P.R. 507, 508 (2012)— es ultra vires y no tiene efecto jurídico ni vinculante alguno.(15)
De más está decir que igual se pone en entredicho la validez de ese desacato. Lo primero que salta a la vista es: ¿qué tipo de desacato es éste? La mayoría está actuando, por propia admisión, en su capacidad de reglamentación de los procesos administrativos, según le ha sido delegado por la Constitución. Entonces la pregunta forzada es, ¿en el contexto de un acto de reglamentación se tiene facultad para imponer la sanción del desacato? ¿Según qué su-puesto? Después de todo, sabemos que el desacato se con-sidera una herramienta coercitiva de los tribunales contra las actuaciones o la ausencia de actuaciones que obstruyan el ejercicio de las funciones de un tribunal dentro de los parámetros de un procedimiento adversativo. S.P. Amadeo, El poder de los tribunales en Puerto Rico para castigar por desacato, Madrid, Ed. Rev. Der. Privado, 1961, pág. 40 (“Bajo ciertas circunstancias constituye desacato al Tribunal desobedecer las órdenes del mismo dictadas durante el curso de un pleito civil o criminal” (énfasis nuestro)).
Anteriormente se ha reconocido como una facultad cons-titucional el hecho de que los tribunales tienen un poder inherente para castigar por la vía del desacato. Véase Ex *675 Parte Robinson, 19 Wall. 505 (1873); El Pueblo Fourquet, 17 D.P.R. 1077 (1911); Ex parte Bird, 4 D.P.R. 234 (1903). No obstante, dicho poder debe ejercerse dentro de unos márgenes de legalidad. Esto, pues no constituye desacato desobedecer una orden de un tribunal cuando el tribunal no tiene poder, de acuerdo con la ley, para dictar la orden desobedecida. Véanse: Amadeo, op. cit., pág. 46; Porrata y Figueroa, 41 D.P.R. 150 (1930). De igual manera, tampoco constituye desacato incumplir con una orden del tribunal cuando ésta contraviene alguna disposición constitucional. Véanse: Amadeo, op. cit., pág. 46; Reyes Delgado v. Corte, 41 D.P.R. 902 (1930).
Precisamente esto último ocurrió al aprobar la Resolu-ción sobre la designación de los miembros de la comisión especial. En tal Resolución, una mayoría de este Tribunal ordenó, so pena de desacato, dejar sin efecto el contrato entre la Oficina de Administración de Tribunales y el Ledo. César López Cintrón. Como dicha orden es inconstitucional porque constituye un acto administrativo que solo le compete al Juez Presidente, la misma es nula y el desacato ipso iure también. Más aún, por tratarse de un desacato producto de un proceso de reglamentación, mas no de ca-rácter judicial, dicho acto coercitivo resulta improcedente en derecho.
III
Puerto Rico hoy transita senderos oscuros. La línea en-tre la norma y su excepción se ha vuelto borrosa. Es por ello que podemos decir hoy que “[e]l estado de excepción es, en este sentido, la apertura de un espacio en el cual la aplicación y la norma exhiben su separación y una pura fuerza-de-ley actúa (esto es, aplica des-aplicando) una norma cuya aplicación ha sido suspendida”. Agamben, op. cit., pág. 83 (“ley” tachado en el original). En atención a *676 lo dicho, vale recordar las palabras del profesor Efrén Rivera Ramos(16) cuando sostuvo que
[e]l Tribunal Supremo depende para su legitimidad de la fuerza de sus argumentos, del respeto que susciten sus deci-siones, de la acogida que logre, en su conjunto, tanto en la comunidad jurídica como entre la población general. Si ese respeto se desvanece, sufre su legitimidad. Ese respeto, sin embargo, no puede simplemente exigirse, sin más. Se lo tienen que ganar los miembros del alto foro con su proceder. El Nuevo Día, 17 de noviembre de 2010; reproducido en: Derecho al De-recho, http://derechoalderecho.org/2010/ll/17/poder-sin-legitimidad -eíren-rivera-ramos / (última visita, 1 de febrero de 2012).(17)
El respeto de un tribunal de la más alta jerarquía, como el nuestro, se obtiene actuando dentro del marco de la le-gitimidad y la legalidad. Si bien la legalidad se desarrolla dentro de un canon positivista, la legitimidad responde a valores sociales sobre la percepción que se tenga del Foro.(18) En otras palabras, responde a consideraciones éti-cas {ethos) que tiene una sociedad sobre esta Institución. Es por ello que la legitimidad que tiene este Foro ante nuestra sociedad se debe obtener dentro del margen de nuestra ley o Constitución, mas no tergiversando nuestro estado de derecho ni escudándose tras el barniz de una aparente legalidad que induce a error, como ha hecho una mayoría de este Tribunal con las Resoluciones aprobadas. *677 La confianza de la ciudadanía queda lacerada ante tal actuación. Se trata, más que nada, de la pérdida de lo que los antiguos romanos llamaron auctoritas jurídica(19)
Así, concluyo con ánimo pesado, pues la salud de nues-tra Rama Judicial se encuentra en un estado crítico y sólo hay presagios de mayores tempestades. Las actuaciones de una mayoría de los integrantes de esta Curia vulneran nuestros entendimientos colectivos, según recogidos en la Constitución. El alcance del hecho consumado será objeto de lamentaciones por generaciones venideras.
Hoy, más que nunca, honremos a don Miguel García Méndez recordando su llamado y comprometiéndonos co-lectivamente a defender nuestra Constitución “con [las] uñas y con [los] dientes”.(20)

 El Voto de Conformidad emitido por una mayoría de esta Curia “aspira a hacer creer” que la acuñada frase crisis constitucional es producto de una “fantasía hiperbólica” de la disidencia. Llegar a tal conclusión es abstraerse de la realidad pública e intelectual que nos rodea.

 Aharon Barak fue Juez Presidente del Tribunal Supremo de Israel (1995-2006). En la actualidad es profesor de Derecho en varias escuelas prestigiosas, entre ellas la Escuela de Derecho de la Universidad de Yale. Además, es autor de Judicial Discretion (1989), Purposive Interpretation in Law (2005), varios libros en hebreo y numerosos artículos en revistas jurídicas de habla inglesa.

 Giorgio Agamben es un filósofo y jurista italiano. Nació en Roma en 1942. En su juventud asistió a los célebres seminarios de Martin Heidegger en Le Thor. Ha dictado cursos en diversas universidades europeas. Desde 1986 es director de pro-grama en el College International de Philosophie de París. Entre sus libros se des-tacan: El hombre sin contenido (1970); Estancias: la palabra y el fantasma en la cultura occidental (1977); El lenguaje y la muerte (1982); Idea de la prosa (1985); La comunidad que viene (1995); Medios sin fin (1996); Lo que queda de Auschwitz (1998); El tiempo que falta (2000), entre otros.

 Contrario al Voto de Conformidad que suscribe la mayoría, no limitaremos nuestra exegesis constitucional sólo al "texto mismo de la disposición constitucional y el historial de la Convención Constituyente”, Voto de conformidad, págs. 576-577, sino que ampliaremos el marco de fuentes que puedan arrojarnos luz sobre esta empresa.

 El texto incluido como apéndice al Diario de Sesiones de este Informe, tiene una anotación al pie de la página en cuanto a la expresión “revisar”, que señala que leía, en su versión original, “supervisar”.

 En la versión original también leía “supervisar”.

 Como bien señala el Voto de Conformidad redactado en un solo acto por seis Jueces de este Tribunal, la Comisión de la Rama Judicial recomendó traspasar al Tribunal Supremo la administración de los tribunales. Pero tal recomendación se enmarca, no dentro de la pugna actual, sino dentro del contexto de afianzar la inde-pendencia judicial al restarle dicha facultad administrativa al Procurador General. Es por ello que tras las ocho facultades recomendadas por la Comisión, el informe indica más adelante: “Se ha creído conveniente designar al Juez Presidente como la persona encargada de la administración de los tribunales ...” (Enfasis nuestro.) 4 Diario de Sesiones de la Convención Constituyente 2613 (1951). Quizás por omisión, el Voto de Conformidad de la mayoría ignora esta última oración cuando cita el informe de la Comisión.

 Véanse, e.g.: Diario de Sesiones de la Convención Constituyente (ed. 1961); Notes and Comments on the Constitution of the Commonwealth of Puerto Rico, Washington, D.C., 1952; Comité para el Estudio y la Evaluación del Sistema Judicial, Informe al Tribunal Supremo sobre la Oficina de Administración de los Tribunales, marzo de 1965; J. Trías Monge, El sistema judicial de Puerto Rico, Río Piedras, Ed. U.P.R., 1978; Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 201 de 22 de agosto de 2003, 4 L.P.R.A. secs. 24-25r.

 Más adelante retomaremos el punto sobre a quién responde la persona nom-brada como Directora Administrativa de los Tribunales.

 Nuevamente, consideraciones de deferencia pueden aconsejar que así se haga, pero la determinación final recae, indudablemente, sobre el administrador de la Rama Judicial: el Juez Presidente.

 Es preciso señalar que las Resoluciones emitidas ordenan menoscabar una obligación contractual entre la Oficina de Administración de los Tribunales y el Ledo. César López Cintrón, a pesar de la prohibición constitucional estatal y federal a tales efectos. Si bien es cierto que al día de hoy no existe relación contractual vigente entre el licenciado López Cintrón y la Oficina de Administración de los Tribunales, no podemos pasar por alto que las Resoluciones ordenaban menoscabar una obligación contractual vigente.

 No debo pasar por alto las descalificaciones personales que se vierten en el voto colectivo de conformidad. Estas, a mi juicio, dicen más de sus emisarios que del referente a quien se dirigen.

 Incluso, dice la mayoría que su expresión de conformidad responde a su obligación de vindicar su poder constitucional. No obstante, resulta improcedente e ilógico vindicar aquello que nunca se tuvo: tanto un poder constitucional como la legitimidad.

 ¿Acaso la mayoría de esta Curia pretende que de ahora en adelante sea el Pleno de este Tribunal quien suscriba hasta los contratos de suministros y demás servicios? Esto, más que irrisorio, redunda en lo absurdo.

 A pesar del argumento de la mayoría de que en la disidencia hay un “intento de hacer creer que este Tribunal actuó más allá de sus contornos constitucionales” (énfasis en el original) Voto de conformidad, pág. 581, debemos señalar que dicho argumento carece de lógica, puesto que no se puede hacer creer lo ya creído por la opinión pública. Nuestra función como Jueces no es hacer creer lo ya creído, sino denunciar con argumentos jurídicos un acto que transgrede el estado de derecho y la Constitución.

 gj Prof. Efrén Rivera Ramos es jurista y poeta, catedrático de la Escuela de Derecho de la Universidad de Puerto Rico. Enseña cursos de Teoría del Derecho, Derecho Constitucional, Derecho y Cultura, entre otros. Fue decano de la misma institución y es autor, entre muchas otras publicaciones, de The Legal Construction of Identity: The Judicial and Social Legacy of American Colonialism in Puerto Rico (APA Books, 2001). Además, es miembro del Seminario en Latinoamérica de Teoría Política y Derecho Constitucional y ha recibido numerosos premios y reconoci-mientos.

 Para unas interesantísimas reflexiones sobre el rol de los jueces y las juezas en una democracia, y sobre la legitimidad de las decisiones de los tribunales supremos, véase S. Breyer, Making Our Democracy Work: A Judge’s View, Alfred A. Knopf (2010).

 Véase Jürgen Habermas, La desobediencia civil, piedra de toque del estado democrático de derecho, en Ensayos políticos, (Ramón García Cotarelo trad.), 1988, pág. 51.

 A. Torrent, Manual de derecho público romano, Zaragoza, Edisofer, S.L., 2002.

 Diario de Sesiones, T. 4, pág. 2472.